IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| BOBBIE F. PETERS OSIER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:10-cv-00044 |
| | ) | |
| MICHAEL J. ASTRUE, in his Capacity as | ) | Judge Thomas A. Wiseman, Jr. |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Before the Court is Plaintiff Bobbie Peters Osier's Motion for Judgment on the Administrative Record (Doc. No. 16; *see also* Doc. No. 17, Brief in Support of Motion ("Pl.'s Brief")) seeking judicial review of the Commissioner's denial of Plaintiff's claims for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"). Plaintiff's motion has been fully briefed and is ripe for consideration. In response to this motion, the Defendant Commissioner of Social Security asserts that the agency's decision denying benefits is supported by substantial evidence in the record and should be upheld. (Doc. No. 20.)

The Court withdraws the previous reference to the Magistrate Judge and, for the reasons explained below, finds that the Commissioner's decision is supported by substantial evidence in the record and that the Administrative Law Judge ("ALJ") applied the correct legal principles in reaching his decision. Accordingly, Plaintiff's Motion will be denied, the decision of the Commissioner affirmed, and this matter dismissed.

## I.       INTRODUCTION

On January 11, 2007, Ms. Osier filed applications for SSI under Title XVI of the Social Security Act (the "Act") and for a period of disability and DIB under Title II of the Act alleging an onset date of April 6, 2005. (Doc. No. 12, Administrative Record ("AR") 108-21.) Plaintiff's claims were denied initially on June 5, 2007 and upon reconsideration on December 28, 2007. (AR 60-66, 70-75.)

Ms. Osier then filed a request for a hearing before an ALJ on January 29, 2008, and on August 4, 2009, ALJ Robert L. Erwin heard her case. (AR 10, 19-54, 74-75.) On September 11, 2009, the ALJ

issued a decision finding that Plaintiff was not entitled to SSI or DIB; Plaintiff subsequently filed a timely request for review by the Appeals Council, which was denied on April 9, 2010. (AR 1-4, 10-18). The ALJ's decision thus became the final decision of the Commissioner, from which the Plaintiff now appeals pursuant to 42 U.S.C. §§ 405(g) and 13183(c)(3). Plaintiff argues that the ALJ erred in according minimal weight to the opinion of Plaintiff's treating physician and in discounting Plaintiff's subjective complaints of disability. (Pl.'s Brief 18.)

This Court must affirm if it finds that the Commissioner's decision is supported by substantial evidence in the record and that the Commissioner did not commit any legal errors in the process of reaching that decision. *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 213 (6th Cir. 1986).

## II.    Review of the Record

Plaintiff Bobbie Peters Osier is a forty-one-year-old woman who was thirty-eight when she filed for SSI/DIB in January 2007. (AR 110.) At the time of her initial filing, Plaintiff was divorced and living with her two school-aged children, but by the time an ALJ heard her case, Plaintiff had remarried and was living with her new husband along with her children. (AR 24-25, 111). Plaintiff completed high school in 1987, obtained an Associate's of Medical Laboratory Technology degree in 1996 from Cumberland Medical School, which is now Medvance, and evidence indicates that she had been pursuing an Associate's Degree in nursing as of 2006. (AR 27, 112, 138, 569.) Although Plaintiff's most recent job was working as hotel front-desk clerk for several weeks in 2006, Plaintiff was last employed for any significant duration of time as a medical laboratory technician at White County Community Hospital, where Plaintiff worked until April 2005. (AR 28.) In the past, Plaintiff has held a number of other jobs including beautician, convenience store clerk, desk clerk, and nurse's aide. (AR 50, 122-28, 135.)

### A.    Medical Evidence—Plaintiff's Health Records[1]

Dr.[2] Randy Denton began treating Plaintiff as her primary care physician in 2000. On July 21, 2000, Dr. Denton saw Plaintiff for a number of complaints including leg pain related to her recurrent thrombophlebitis. (AR 593.) Similarly, on May 24, 2001, Plaintiff saw Dr. Denton for a myriad of complaints including fatigue. (AR 591.) On June 25, 2001 and again July 16, 2001, Dr. Denton treated

---

[1] Because of the length and breadth of Plaintiff's medical records, the following section provides an extensive but not wholly exhaustive overview.

[2] Unless otherwise noted, all parties identified as "Dr." are Medical Doctors.

Plaintiff for stiffness and pain in her neck and back and back spasms arising from a whiplash injury Plaintiff sustained after her car was rear-ended. (AR 590.) Dr. Denton saw Plaintiff on December 10, 2001 to address her concerns about soreness in her left breast and a sprain in her right knee. (AR 589.) After being diagnosed with and treated for pneumonia by another physician, Plaintiff visited Dr. Denton on January 9, 2002 complaining of fatigue. (AR 588.) Throughout the course of these visits, Dr. Denton prescribed a number of drugs including narcotic analgesics, anti-inflammatories, muscle relaxants, sleep-aids, and anti-anxiety drugs. (AR 588-593.) Further, Dr. Denton noted on multiple occasions that Plaintiff's work schedule and home life created a stressful environment and that rest and relaxation would likely alleviate some of her issues (*See, e.g.*, AR 588, 589, 590.)

On July 23, 2002, Plaintiff visited Dr. Denton after suffering a small non-Q-wave myocardial infarction; Dr. Denton placed plaintiff on a drug regimen and scheduled an appointment for her with a Dr. Hanna, which Plaintiff missed. (AR 587.) Dr. Denton followed up with Plaintiff on July 30, 2002 to adjust her medications. (AR 586.) Plaintiff next visited Dr. Denton on March 4, 2003 to discuss the fact that she had filed for divorce and that she was struggling to manage her children and work; Dr. Denton discussed her FMLA form with her. (AR 585.)

Plaintiff did not visit Dr. Denton again until March 23, 2004, when she came to his office complaining of leg pain related to her chronic thrombophlebitis and back pain; despite her obvious swelling and pain, Plaintiff's strength and reflexes remained normal. (AR 584.) Dr. Denton placed Plaintiff on an anti-inflammatory, muscle relaxant, an anti-platelet agent, a steroid dose pack, and a narcotic analgesic. (*Id.*)

On April 1, 2004, Plaintiff saw Dr. S. Craig Humphreys at the Center for Sports Medicine and Orthopaedics complaining of pain in her back and lower left extremity. (AR 216.) A physical examination revealed that Plaintiff had good muscular tone, normal range of motion and gait, did not display any atrophy, and did not exhibit any pain with rotation. (AR 217.) Treatment notes from the Center for Sports Medicine and Orthopaedics also provide an impression of L4-L5 disc desiccation and herniated nucleus pulposus. (*Id.*)

On April 23, 2004, Plaintiff visited Dr. Stephen Dreskin at the Atrium Memorial Surgery Center where she received an interlaminar epidural injection at L5-S1; at the time of her discharge, Plaintiff reported her pain to be a zero on a scale of zero to ten, in which zero meant no pain. (AR 205, 209.)

On April 28, 2004, Plaintiff was working at White County Community Hospital when a patient with Down's Syndrome on whom she was attempting to start an IV became combative and knocked her to the ground. (AR 231.) Plaintiff had been in a squatting position and fell approximately six inches before landing on her backside. (*Id.*) Prior to this incident Plaintiff had noted improvements following her last injection, but after this incident, Plaintiff complained of increased pain in her back, left hip, and left leg. (*Id.*) Plaintiff filed for and eventually received Workers' Compensation benefits for this accident.

On May 12, 2004, Plaintiff returned to Dr. Humphreys for a follow-up visit complaining of pain in her low back, right groin, and right lower extremity. (AR 215.) Notes from the visit further indicate that Plaintiff had visible edema in her left lower extremity. (*Id.*) Dr. Humphreys ordered an MRI of Plaintiff's right hip and physical therapy. (*Id.*)

On May 20, 2004, Plaintiff visited Dr. Denton after an MRI revealed that she had two ruptured disks. Dr. Denton prescribed some pain medication and referred her to a neurosurgeon because he saw this issue as a surgical problem. (AR 584.)

Plaintiff next saw Dr. Denton on June 2, 2004. (AR 216-17, 582). Dr. Denton assisted Plaintiff in filling out her FMLA paperwork, refilled her pain medication, noted that she would be seeking a second opinion from another neurosurgeon, and reiterated his belief that Plaintiff was a good candidate for surgery. (AR 582.)

On May 28, 2004, Plaintiff was seen by Julianne Buckner, P.A.C, for Dr. Joseph Jestus. Plaintiff complained of difficulty sitting, standing, and walking due to her back pain as well as some pain in her groin and leg. (AR 219.) Ms. Buckner noted that a steroid injection had helped Plaintiff in the past and recommended scheduling additional injections. (AR 220.) On June 29, 2004, Dr. Denton adjusted Plaintiff's medication because her pain was not subsiding and was interfering with her ability to complete daily tasks of living. (AR 581.)

Plaintiff saw another neurosurgeon, Dr. Eugenio Vargas, on July 19, 2004 for her complaints of back, leg, and groin pain. Dr. Vargas determined that Plaintiff was symptomatic for a left L5 disk

herniation and scheduled her for a left-side L5 semi-hemilaminectomy, medial facetomy, and microscopic discectomies, all of which were performed on July 22, 2004. (AR 692-99.) At a follow-up consultation on August 9, 2004, Dr. Vargas noted that Plaintiff was doing well overall despite some remaining issues, that Plaintiff should begin range-of-motion exercises four weeks post-operation, and that Plaintiff could return to work in six weeks. (AR 690.)

After returning to work, Plaintiff visited Dr. Vargas on October 4, 2004 reporting some lower back pain, and on October 18, 2004, Plaintiff received treatment for back pain at White County Hospital. (AR 658, 689.) Further, Dr. Vargas's notes indicate that on October 23, 2004, Plaintiff called him reporting that she had injured her back the week before. The next day, Dr. Vargas received x-rays and MRI results from the Baptist West Emergency Room, which Dr. Vargas reviewed on November 22, 2004 to conclude that Plaintiff had some post-operative changes—most notably epidural scarring. (AR 686-88.) On November 29, 2004, Dr. Vargas completed FMLA papers for Plaintiff and suggested that she perform back exercises daily, and on December 3, 2004, he prescribed Plaintiff a Medrol Dose Pak. (AR 682-84.)

On December 15, 2004, Plaintiff returned to Dr. Denton complaining of pain and stress because she was going through a difficult divorce; in the interest of giving Plaintiff some short term relief, Dr. Denton prescribed a narcotic analgesic, an anti-inflammatory, and an antidepressant. (AR 578.) Dr. Denton next saw Ms. Osier on February 9, 2005 to evaluate Plaintiff after she had fallen and landed on her backside and to address a tender node in Plaintiff's neck. Dr. Denton placed Plaintiff on an antibiotic for the node in her neck and determined that though Plaintiff might have some swelling and tenderness, she had not aggravated her recent surgery. (AR 577.) Dr. Denton approved Plaintiff to return to work and also noted that Plaintiff was looking good and had lost weight. (*Id.*)

On February 28, 2005, Plaintiff's car was rear-ended and totaled, and Plaintiff was taken to White County Hospital where she reported pain, tingling, and numbness in her neck and arms for which she received a narcotic analgesic and a muscle relaxant. (AR 620, 663-68.) Plaintiff returned to White County Hospital on March 3, 2005 complaining of a headache and was prescribed a benzodiazepine-based anti-anxiety drug, an anti-depressant, and a higher-dose narcotic analgesic. (AR 672.)

On March 7, 2005 and again on March 21, 2005, Plaintiff returned to Dr. Denton, who monitored her condition after the accident, refilled her anti-inflammatory and pain-relief medications, and warned

Plaintiff that she would likely have chronic back pain. (AR 574-75.) An MRI conducted the next day, on March 22, 2005, revealed a C5-C6 HNP—essentially a slipped disc—with a possible mild cord impingement. (AR 555.)

Plaintiff returned to Dr. Denton on April 6, 2005 complaining both that her pain was excruciating and that she did not like taking pain medication; Dr. Denton adjusted some of her medications and referred Plaintiff back to Dr. Vargas as Dr. Denton considered Plaintiff's original back surgery to be a failure. (AR 574.) Plaintiff had another MRI performed at Baptist Hospital West, which revealed herniations of varying degrees of severity at L5-S1 and L4-L5. (AR 747.)

April 6, 2005 notes from Dr. Michael Ellis, D.C. at the Gateway Chiropractic Center indicate that Plaintiff's spinal injuries would prevent her from returning to work until April 18, 2005. (AR 617.)

Plaintiff saw Dr. Vargas on April 7, 2005 to discuss the possibility of another surgery; at this time, Dr. Vargas indicated that Plaintiff was not to work. (AR 727-728.) Plaintiff opted for surgery, and on May 12, 2005, Ms. Osier underwent an anterior cervical discectomy at C5-C6 with bilateral foraminotomy. Following this surgery, Dr. Vargas discharged Plaintiff and instructed her not to lift over five to ten pounds, a restriction Dr. Vargas echoed at Plaintiff's May 20, 2005 follow-up visit. (AR 679, 722-23.) Plaintiff returned to Dr. Vargas on June 17, 2005 reporting trouble in her lower back and left leg. Dr. Vargas assessed that Plaintiff had done very well with respect to the cervical disk herniation, gave plaintiff range of motion and strength exercises, and discussed whether Plaintiff's pain was such that Plaintiff would want to consider another back surgery. (AR 678.) Dr. Vargas recommended that Plaintiff undergo a Functional Capacity Evaluation to determine if she could return to her work as a nurse and refilled plaintiff's muscle relaxants and pain medication. (*Id.*)

On July 26, 2005, Plaintiff underwent another surgery to re-explore her left-side L5 hemilaminectomy and excise the recurrent disc herniation followed by a posterior lumbar interbody fusion from L5-S1. Postoperatively, Dr. Vargas diagnosed Plaintiff with a recurrent L5 left-sided disc herniation, L5 degenerative disc disease, and an L5 left-sided laminar fracture. (AR 761-66.) On August 3, 2005, Dr. Vargas noted that Plaintiff's leg pain had resolved postoperatively, and on September 7, 2005, Plaintiff reported to Dr. Vargas that she was not suffering from any leg pain and only mild to moderate low back pain at the end of the day. (AR 268.)

On October 1, 2005, Plaintiff was involved in another motor vehicle accident and returned to Dr. Denton on October 31, 2005 complaining of shoulder pain. Dr. Denton added Voltaren, an anti-inflammatory, to Plaintiff's medication regimen and recommended that Plaintiff begin physical therapy. (AR 572.) Rather than attend formal physical therapy herself, Plaintiff opted to receive therapy from a friend who was undergoing physical therapy. (AR 571.) Plaintiff returned to Dr. Denton for a follow-up on November 17, 2005. (*Id.*) Plaintiff had stopped taking Voltaren and requested that Dr. Denton switch her muscle relaxant because the medication upset her stomach. (*Id.*) At Plaintiff's behest, Dr. Denton also prescribed anti-anxiety medication to treat her increasingly frequent panic attacks and refilled her script for pain management medication. Dr. Denton noted that while Plaintiff's shoulder still hurt, her range of motion had improved. (*Id.*)

Plaintiff next saw Dr. Denton on December 28, 2005. Although Plaintiff's shoulder had improved, Plaintiff was suffering from pain in her right elbow that prevented her from lifting or gripping. To treat this pain, Dr. Denton locally injected Plaintiff with an anti-inflammatory and anesthetic. (AR 571.) Plaintiff returned to Dr. Denton on February 15, 2006 again complaining of elbow and shoulder pain as well as Restless Leg Syndrome ("RLS"). (AR 570.) Dr. Denton gave Plaintiff another injection to assuage her elbow pain, started Plaintiff on Requip for her RLS, and, at Plaintiff's request, switched her narcotic analgesic from Oxycodone to Hydrocodone. (*Id.*)

In a February 12, 2006 letter, Dr. Vargas corresponded with Plaintiff's workers' compensation attorney, Mr. Henry Fincher, stating that Plaintiff had reached maximum medical improvement for her disc herniation that became symptomatic "around April 2004." (AR 266) Because of this herniation, Plaintiff was awarded a 10% whole-person impairment. (*Id.*) Further, in Plaintiff's February 13, 2006 deposition for her workers' compensation case, Plaintiff described her symptoms of low back pain, which included difficulty standing, difficulty sleeping, and an inability to lift more than twenty (20) pounds. (*Id.*)

On March 1, 2006, Dr. David Gaw, an independent medical examiner, assessed Plaintiff and provided diagnoses of degenerative lumbar disc disease, post-operative lumbar spine surgery, post-operative anterior cervical discectomy, and fusion at C5-C6. (AR 224.) Dr. Gaw indicated that Plaintiff could lift up to twenty (20) pounds frequently and forty pounds (40) occasionally and that Plaintiff should avoid frequently twisting her back or placing herself in awkward positions. (AR 224-25.)

On April 24, 2006, Plaintiff returned to Dr. Denton for another epidural steroid injection in her right elbow. (AR 569.) At this visit, Dr. Denton broached the possibility of Plaintiff's seeing an orthopedist, but Plaintiff stated that she was too busy trying to finish her Associate's Degree in nursing, so Dr. Denton opted to try to "patch her up a little longer." (AR 569.)

On May 4, 2006, Dr. Robert Dimick, an independent medical examiner, provided opinions based on Plaintiff's work-related injuries. Dr. Dimick noted that Plaintiff was able to sit comfortably without needing to change positions for the entire forty five minutes of her examination, that Plaintiff could move quickly from sitting to standing, and that Plaintiff demonstrated a fully functional range of motion. (AR 261.) Dr. Dimick assessed Plaintiff to have the following conditions: chronic left leg edema with reported pain from deep vein thrombosis dating back to a 1994 on-the-job injury; chronic medication use and possible development of tolerance due to this long term use of narcotics to treat her leg pain; multiple psychosocial stressors affecting her pain level and ability to cope with painful events; a traumatic onset of lower back pain, right groin pain, and left posterior thigh sclerotomal pain; per Plaintiff's March 29, 2004 MRI, central and rightward L4-L5 disk protrusion and L5-S1 leftward disk protrusion—questionable clinical correlation; right hip and lower back contusion resulting from Plaintiff's April 28, 2004 work injury; excision of the left L5-S1 subligamentous disc herniation; motor vehicle accident on February 28, 2005 with subsequent C5-C6 fusion; recurrent L5-S1 herniated disk, which was subject to a posterior lumbar interbody fusion on July 26, 2005—although this fusion likely failed; and mild to moderate inconsistencies between Plaintiff's injuries and what would be expected based on the description of her accident. (AR 260, 301.) With regard to Plaintiff's workers' compensation claim, Dr. Dimick testified that he did not feel Plaintiff had suffered any permanent injury or retained any restrictions as a result of her fall on April 28, 2004. (AR 297, 301.)

On March 7, 2007, Dr. Jerry Lee Surber completed a consultative examination of Plaintiff and reviewed Plaintiff's medical records from her visits to Dr. Denton from February 2006 through April 2006. (AR 401.) During this examination, Plaintiff complained of shortness of breath but reported no chest pain; Plaintiff also frequently complained of headaches and reported that she had an Arnold Chiari malformation. (AR 406.) Plaintiff also complained of pain in her neck, lower back, shoulders, and elbows as well as numbness, tingling, burning in her hands and feet with additional pain when they were bearing

weight. (AR 401-02.) Dr. Surber noted 2-3/4+ bilateral pretibial and ankle edema but no hand or wrist edema. (AR 402.) In spite of this edema, Dr. Surber noted that Plaintiff did not appear to have been wearing the compression stockings she had been prescribed. (AR 406.) Dr. Surber also documented that Plaintiff had a full range of motion in her elbows, hips, knees, ankles, wrists, and fingers as well as the ability to perform straight leg raises without any pain. (AR 404.) Further, Dr. Surber found that Plaintiff did not exhibit any limping or antalgic gait. (*Id.*) Additionally, Dr. Surber provided impressions of slight obesity, hypertension, gastroesophageal reflux disease, depression, anxiety, bipolar disorder, chronic obstructive pulmonary disease ("COPD"), atherosclerotic coronary vascular disease, and peripheral vascular disease. (AR 404-05.) Based on this assessment and his review of Dr. Denton's medical records, Dr. Surber concluded that during an eight-hour work day, Plaintiff would be able to stand, walk, or sit for six to eight hours, would be able to frequently lift and carry ten to twenty pounds. (AR 406.)

Also on March 7, 2007, an x-ray of Plaintiff's lumbar spine that had been ordered by "TN State of Disability" revealed post-surgical changes at L5-S1 but that the other disc spaces were well-maintained and that the spine appeared to be stable. (AR 408.)

For the first time in eleven months, Plaintiff returned to Dr. Denton on March 29, 2007. In this meeting, Plaintiff complained that she was miserable, that she was struggling with her son, that her reflux was flaring up, that she was having hot flashes, and that her back continued to hurt. (AR 566.) While Dr. Denton noted that Plaintiff did not appear ill, he restarted her on an antidepressant, an antiemetic, and an antacid. (*Id.*)

On April 17, 2007, Mark Loftis, M.A., S.P.E. completed a disability examination of Plaintiff. Mr. Loftis noted that Plaintiff had driven herself to this examination and that most of her functions such as gait, posture, motor skills, speech, and vision displayed normally. (AR 409.) Mr. Loftis's mental evaluation indicated that Plaintiff possessed an average range of intellectual functioning. (AR 411.) During this examination, Plaintiff indicated her activities of daily living included cooking approximately one meal per day, loading and unloading the dishwasher, talking on the telephone, and sleeping. (AR 410-11.) Mr. Loftis diagnosed Plaintiff with depressive disorder based on Plaintiff's description of her crying spells, irritability, problems sleeping, excessive worrying, and gaining weight. (AR 411-12.) Mr. Loftis

concluded that while Plaintiff's depression might impair her ability to deal with work-related stressors and to communicate effectively with co-workers and supervisors, Plaintiff had room for improvement. (AR 412.) Further, Mr. Loftis found Plaintiff's primary limitations to be her mobility and inability to deal with the physical demands of work. (*Id.*)

Plaintiff returned to Dr. Denton for a follow up on April 26, 2007 stating that she was "just miserable," that she lived in pain every day, and that her current antidepressant was not working. (AR 565.) Dr. Denton stated that he was sure that most of Plaintiff's depression was related to her pain and that Plaintiff was a good candidate for Cymbalta, another antidepressant, which Dr. Denton prescribed. (*Id.*)

On May 16, 2007, Dr. Pilar Vargas[3] performed a psychiatric review technique assessment on Plaintiff, which indicated that an additional residual functional capacity assessment ("RFC") would be necessary. (AR 415.) This psychiatric review technique report revealed that Plaintiff had a depressive disorder that did not precisely satisfy the diagnostic criteria. (AR 418.) While assessing the "B" criteria,[4] Dr. Vargas indicated that Plaintiff had mild limitations restricting her activities of daily living, concentration, persistence or pace, and moderate limitations to her ability to maintain social functioning; Dr. Vargas further noted that Plaintiff had not had any episodes of decompensation. (AR 425.) Based on this evidence, Dr. Vargas concluded that Plaintiff did not establish the presence of "C" criteria.[5] (AR 426.) Dr. Vargas found Plaintiff's claimed inability to do any work to be partially credible and that Plaintiff's impairments did not meet or equal the listings. (AR 427.)

On the same day, May 16, 2007, Dr. Pilar Vargas also completed a mental RFC, an assessment of Plaintiff's ability to perform work-related activities. (429-32.) This twenty-category assessment indicated that Plaintiff was moderately limited in her ability to: interact appropriately with the general

---

[3] Not to be confused with Dr. Eugenio Vargas, the neurosurgeon who performed several operations on Plaintiff. *See, infra* 4-6.

[4] For a claimant to be found to meet the listing-level severity for any Section 12.00 Listing, the claimant must demonstrate that her mental impairment has caused at least two of the following functional limitations, known as the paragraph "B" criteria: marked restrictions in activities of daily living; marked difficulties in maintaining social function; marked difficulties in maintaining concentration, persistence or pace, mark; and repeated episodes of decompensation, each of extended duration. 20 C.F.R. Part 404, Subpart P, App. 1 (Listings).

[5] Paragraph "C" criteria are only assessed if the ALJ finds that the claimant has not satisfied the paragraph "B" criteria. 20 C.F.R. Part 404, Subpart P, App. 1 (Listings). Paragraph C criteria assess the degree of functional limitation the additional impairments impose to determine if they significantly limit plaintiff's physical or mental ability to perform work activities. *Id.*

public; accept instructions and respond appropriately to criticism from supervisors; and respond appropriately to changes in the work setting. (AR 429-30.) Dr. Vargas, however, indicated that Plaintiff was not significantly limited in the remaining seventeen categories and concluded overall that plaintiff had no significant problems. (*Id.*)

On May 17, 2007, Plaintiff again visited Dr. Denton complaining of unrelenting pain. (AR 564.) Dr. Denton also recorded that Plaintiff had been suffering from some near syncopal episodes with orthostatis hypotensive symptoms—commonly known as "dizzy spells" or "head rushes"—which Dr. Denton suspected may have been related to Plaintiff's blood pressure. (*Id.*) Dr. Denton refilled Plaintiff's Requip for her RLS, placed Plaintiff on a time-release morphine and an anticonvulsant, and prescribed a trial of Florinef, a synthetic corticosteroid. (*Id.*)

On May 24, 2007, Dr. Joe G. Allison completed a physical RFC assessment based on his review of Plaintiff's medical records. (AR 433-40.) Dr. Allison noted a primary diagnosis of back disorder with a secondary diagnosis of neck disorder. (AR 433.) Dr. Allison determined that, in an eight-hour work day, Plaintiff could stand or walk for about six hours, sit for six hours, frequently lift or carry ten pounds and occasionally lift or carry twenty pounds. (AR 434.) Dr. Allison also found that Plaintiff could push or pull without any restrictions and could occasionally climb stairs or ramps, balance, stoop, kneel, crawl, or crouch; however, Dr. Allison stated that Plaintiff was not able to climb ladders, ropes, or scaffolds. (AR 434-35.) Dr. Allison found that Plaintiff had no manipulative, visual, or communicative limitations but that she should avoid concentrated exposure to hazards. (AR 436-37.)

The next day, on May 25, 2007, Jerome M. Nnawude of the Tennessee Department of Rehabilitation Services completed a vocational analysis worksheet for Plaintiff. (AR 164-67.) His report indicated that Plaintiff was moderately limited in her ability to interact appropriately with the general public, to accept instruction and respond appropriately, and to respond appropriately to changes in the work setting but that Plaintiff was not significantly limited in the remaining seventeen categories. (AR 164.) Mr. Nnawude's findings about Plaintiff's physical capacity mirrored those of Dr. Allison. (*Id.*)

Plaintiff returned to Dr. Denton on June 20, 2007. (AR 562.) Plaintiff had stopped taking Cymbalta because it was too expensive. (*Id.*) Dr. Denton stated that while Cymbalta is not indicated for chronic back pain, he believed that Plaintiff was also suffering from depression secondary to her pain and

that Cymbalta had been helping her cope. (*Id.*) Dr. Denton also noted that there seemed to be a tug of war between Plaintiff's workers' compensation attorney and the "worker's comp people." (*Id.*) Dr. Denton gave Plaintiff some samples of Cymbalta hoping to keep her on the drug until her workers' compensation issues were resolved. (*Id.*)

In June 2007, Plaintiff was referred by the Avalon Center, a program for domestic violence and sexual assault, to Jeraldine A. Ziegele, Ed. S., LPC/MHSP for therapy. (AR 454.) Plaintiff came to Ms. Ziegele after her ex-husband violated an Order of Protection and threatened to burn her house down, kill her, and kill her children. (*Id.*) Plaintiff complained of a number of symptoms, most notably depression, and Ms. Ziegele's treatment sessions focused on reducing this depression and teaching Plaintiff sound decision-making skills. (*Id.*) These therapy sessions continued for a number of months.

On October 22, 2007, Dr. John R. Thompson evaluated Plaintiff and diagnosed her with bilateral medial epicondylitis—commonly known as tennis elbow—and lateral epicondylitis—commonly known as golfer's or thrower's elbow. (AR 445, 451.) Dr. Thompson noted that he could assign no disability for Plaintiff's elbow pain and stated that Plaintiff needed to wear protective elbow braces when performing vigorous activities. (AR 446.)

On November 20, 2007, Ms. Ziegele submitted a letter that included some of the results of her continued counseling with Plaintiff as well as a mental RFC assessment. (AR 454, 456.) Ms. Ziegele stated that Plaintiff's progress was adequate and that Plaintiff was coping well on most days but that she expected supportive therapy to continue for at least several more months to ensure the Plaintiff could continue honing her coping skills and not succumb to the severe stressors she was facing. (AR 455.) In her assessment of Plaintiff's ability to do work-related activities, Ms. Ziegele found that Plaintiff had a poor to no ability to deal with work stresses, demonstrate reliability, or maintain attention and concentration and that Plaintiff's bouts of serious depression could limit the number of days she would report to work. (AR 456-57.) Ms. Ziegele rated Plaintiff's capacity to be good[6] or fair[7] for the remainder of the criteria considered in the assessment. (*Id.*)

---

[6] Plaintiff's ability was good with respect to the following criteria: following work rules; relating to coworkers; using judgment; interacting with supervisors; functioning independently; understanding, remembering, and carrying out detailed but not complex job instructions and simple job instructions.

On November 29, 2007, Dr. Denise P. Bell completed another physical RFC assessment for Plaintiff. (AR 459.) Like Dr. Allison, Dr. Bell noted a primary diagnosis of back disorder with a secondary diagnosis of neck disorder. Dr. Bell also assessed that in an eight-hour work day Plaintiff could stand or walk for about six hours and sit for six hours, and that Plaintiff could frequently lift or carry ten pounds and occasionally lift or carry twenty pounds as well as push or pull without any further restrictions. (AR 460.) In contrast to Dr. Allison and Mr. Nnawude's findings,[8] Dr. Bell assessed that Plaintiff could frequently climb both ramps or stairs and ladders, ropes or scaffolds as well as frequently balance, stoop, kneel, crouch, or crawl. (AR 461.) Dr. Bell further found that Plaintiff had no manipulative limitations beyond her limited ability to reach in all directions including overhead. (AR 462.)

On December 10, 2007, Dr. William Regan completed a psychiatric review technique on Plaintiff, which indicated that a further RFC assessment was necessary. (AR 467.) Dr. Regan's psychiatric report indicated that Plaintiff manifested a medically determinable impairment but that it did not precisely satisfy any of the diagnostic criteria in the review. (AR 470.) In assessing the "B" criteria, Dr. Regan found that Plaintiff was mildly restricted in her activities of daily living and had moderate difficulties maintaining social functions and maintaining concentration, persistence, or pace. (AR 477.) Dr. Regan also assessed that Plaintiff had had one or two episodes of extended-duration decompensation. (*Id.*) This evidence did not establish the presence of any "B" or "C" criteria. (*Id.*)

Dr. Regan completed his mental RFC assessment of Plaintiff on the same day. (AR 481.) This report found that Plaintiff was not significantly limited in fourteen of the twenty assessment criteria but that Plaintiff was moderately limited in her ability to understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; and to respond appropriately to changes in the work setting. (AR 481-82.) Based on these findings, Dr. Regan concluded that Plaintiff could perform simple and lower-level detailed tasks with

[7] Plaintiff's ability was fair with respect to the following criteria: dealing with the public; understanding, remembering, and carrying out complex job instructions; maintaining personal appearance, behaving in an emotionally stable manner; and relating predictably in social situations.
[8] *See, infra*, 10.

normal supervision and that her social interactions and adaption would be adequate to perform these tasks. (AR 483.)

Also on December 10, 2007, Dr. Denton completed a medical source statement regarding Plaintiff's ability to do work-related physical activities. (AR 486.) Dr. Denton reported that Plaintiff could lift less than ten pounds, that Plaintiff could stand and/or walk for less than two hours in an eight-hour work day, and that Plaintiff could sit for about four hours during an eight-hour work day. (*Id.*) Moreover, Dr. Denton indicated that Plaintiff had limited use of her lower extremities, that her pain would constantly interfere with her concentration and attention, and that Plaintiff was incapable of even low stress jobs. (AR 487.) Dr. Denton further stated that Plaintiff would sometimes need to take unscheduled breaks during an eight-hour work day and that Plaintiff's impairments would likely produce "bad days" causing Plaintiff to miss work more than four times a month. (*Id.*)

On December 12, 2007, William N. Benjamin of the Tennessee Department of Rehabilitation Services completed a vocational analysis worksheet for Plaintiff. (AR 178.) This report reflected Mr. Benjamin's opinion that, during an eight-hour work day, Plaintiff could stand and/or walk for six hours, sit for about six hours, lift twenty pounds occasionally and ten pounds frequently, and push or pull without any limitations as well as frequently balance, stoop, kneel, crouch, crawl, and climb stairs, ramps, ladders, ropes, and scaffolds. (*Id.*) The report also indicated that while Plaintiff was limited in her ability to reach in all directions including overhead, she did not have any visual, communicative, or environmental limitations, and no other manipulative limitations. (*Id.*) The report also included a mental RFC assessment, which mirrored the findings of Dr. Regan's December 10, 2007 assessment.[9] (*Id.*)

On January 3, 2008, Plaintiff returned to Dr. Denton stating that although she could not point to any triggering event, she was in agonizing pain. (AR 559.) Dr. Denton noted that Plaintiff looked "as down as I've ever seen her" and that she could barely get out of her wheelchair.[10] Dr. Denton placed Plaintiff on additional morphine, a steroid dose pack, and a Fentanyl patch—an exceedingly powerful narcotic pain medication. (*Id.*) Dr. Denton ordered an MRI of Plaintiff's lumbar spine, and on January 11, 2008, a radiologist, Dr. Richard Bilbrey, read and recorded the results of this MRI. (AR 514.) Dr. Bilbrey

---

[9] *See, infra*, 13.
[10] While the record refers to Plaintiff's temporarily being in a wheelchair, it fails to indicate when or why Plaintiff either began or ceased using this wheelchair.

stated that while there was evidence of surgery and some mild changes at L5-S1, the images revealed adequate space for the dural sac and neural forminal openings at all levels. (*Id.*)

Plaintiff returned to Dr. Denton for a follow-up appointment on January 16, 2008. (AR 559.) Dr. Denton reviewed Plaintiff's MRI results with her noting that there was not much more he could do for her and that painful "flares" would likely be a continuing issue for her. (*Id.*) Dr. Denton stated that he believed the "heart and soul" of Plaintiff's long-term management would be getting Plaintiff to lose weight and improve her core strength, and to begin walking again but that he understood Plaintiff's pain made this progression difficult. (*Id.*) After increasing Plaintiff's morphine at her last consultation, Dr. Denton began to taper the dosage down to 45 mg daily in hopes of eventually reaching 30 mg a day. (*Id.*) Dr. Denton refilled Plaintiff's hydrocodone and placed her back on a muscle relaxer. (*Id.*) Dr. Denton also indicated how pleased he was that Cymbalta continued to help Plaintiff. (*Id.*)

Following Plaintiff's initial contact with Ms. Ziegele in June 2007,[11] Ms. Ziegele continued to meet regularly with Plaintiff either weekly or bi-weekly until she issued a July 14, 2008 report. (AR 595.) In this report, Ms. Ziegele stated that Plaintiff continued to experience several "troubling symptoms" and that her "seeming stability" was likely a result of her adaptively numbing herself to the stressors around her. (*Id.*) Nonetheless, Ms. Ziegele noted that Plaintiff's stability had increased and that she was able to adequately perform activities of daily living. (*Id.*) Similarly, both prior and subsequent treatment notes reveal that Plaintiff was depressed but she behaved appropriately and appeared oriented with good judgment, good insight, and clear thought process and content. (AR 610, 612-15, 778-80.) Ms. Ziegele recommended continuing therapy and her records reflect that this therapy continued until at least July 2009. (AR 595, 780.)

On October 29, 2008, Plaintiff returned to Dr. Denton for her first visit in ten months seeking treatment for a myriad of complaints—most notably depression and chronic coccyx pain. (AR 598.) Dr. Denton noted that Plaintiff was not consistently taking Cymbalta and expressed a desire that she continue to use it more consistently; he also addressed a number of Plaintiff's other complaints. (*Id.*)

On June 8, 2009, Plaintiff visited Dr. Jeffrey Loveland, D.P.M. to discuss the possibility of surgical treatments to assuage the pain and swelling in her left foot. (AR 791.) Dr. Loveland noted that Plaintiff

---

[11] *See, infra*, 12.

had attempted a number of more conservative treatment methods including night braces and orthotics before recommending an out-patient procedure of microablation/tentomy.  (AR 792-93.)

On June 16, 2009, Dr. Jeffrey A. Uzzle, a consulting orthopedist, examined Plaintiff and her medical records to diagnose her with chronic left lumbar radiculopathy post two lumbar surgeries.  (AR 781, 783.)  Dr. Uzzle noted that Plaintiff's posture, ability to heel-and-toe walk, spinal alignment while standing, and gait pattern were all normal.  (AR 782.)  Dr. Uzzle further found that Plaintiff's lumbar range of motion was normal except for flexion to sixty degrees, that Plaintiff had symmetrical pedal pulses, that Plaintiff could perform a straight leg raise to sixty degrees, and that Plaintiff did not exhibit any muscle spasms.  (*Id.*)  Dr. Uzzle also reported mild weakness in the left L5 myotome and 4+/5, borderline atrophy of the left calf circumference.  (*Id.*)

On June 19, 2009, the Tennessee Department of Human Services approved Plaintiff for family assistance finding her incapacitated due to her chronic pain following her cervical fusion.  (AR 616.)

On July 23, 2009, Dr. Denton completed another medical source statement regarding Plaintiff's ability to do work-related physical activities.  (AR 778-90.)  The findings in this statement were identical to those in Dr. Denton's December 10, 2007 statement.[12]  (*Id.*)  On December 14, 2009, Dr. Denton submitted a letter reaffirming that he alone had completed Plaintiff's medical source statements from both December 2007 and July 2009.  (AR 798.)

On July 29, 2009, Dr. Loveland performed a microablation/tentomy on Plaintiff's left heel at White County Hospital.  (AR 794-95.)

**B.      Plaintiff's Hearing Testimony**

At her August 4, 2009 hearing before Administrative Law Judge Robert L. Erwin, Plaintiff Bobbie Peters Osier testified that she was forty years old and lived with her husband and two children.  (AR 24-25.)  Plaintiff gave her height as six feet tall and weight as two hundred and ten pounds, which Plaintiff testified was about thirty-five pounds heavier than she was prior to her injuries in 2005.  (AR 25-26.)  Plaintiff said that she had a valid driver's license but that she only drove a couple of times a week.  (AR 26-27.)  Plaintiff also testified that she had an Associate's Degree in Medical Laboratory Technology from Cumberland Medical School, now Medvance.  (AR 27.)

---

[12] *See infra*, 14.

Plaintiff stated that her last job was at White County Community Hospital in April 2005. (AR 28.) Upon prompting from the ALJ, Plaintiff recalled that she had, in fact, worked for a few weeks as a front desk clerk at a Ramada Inn in 2006, but she quit because her pain prevented her from doing her job. (AR 28.)

In reviewing her medical records with the ALJ, Plaintiff stated that she has had two back surgeries and a neck surgery and that following these surgeries she sustained an injury to her lower back. (AR 29-30.) Plaintiff claimed that she was able to walk about a half-mile prior to these injuries and surgeries. (AR 48.)

Plaintiff stated that her pain radiated to her groin and feet at times and that on a scale of zero to ten with zero being no pain and ten being the worst possible pain, her back pain was around a three or four when resting. (AR 39-41.) After sitting in the hearing for thirty minutes, she rated her pain as a seven. (AR 41.) Likewise, Plaintiff rated her neck pain as a four out of ten. (AR 42.) Plaintiff described the pain in both her neck and back as dull, constant, and beating. (AR 41.) Plaintiff testified that although she is able to lift her arms over her head, this action increases her pain to a six out of ten. (*Id.*) Similarly, Plaintiff stated that standing or bending makes her back pain unbearable and that she can stand for twenty minutes before her pain increases to a seven. (AR 42-44.) Plaintiff clarified that all of the pain levels she described were while she is on her medications. (AR 45.)

Plaintiff testified that she was seeing a counselor for acute depression and that she felt that she suffered from Post Traumatic Stress Disorder because she was injured by a patient who attacked her while she was working. (AR 49.) Plaintiff also stated that she sleeps a lot during the day and struggles to sleep at night. (*Id.*)

### C.  Vocational Expert Testimony

A vocational expert ("VE"), Julian Nadolsky, also testified at Plaintiff's August 4, 2009 hearing. (AR 50.) The VE stated that Plaintiff's past relevant employment included light unskilled jobs as a beautician and a convenience store clerk, light semiskilled jobs as a desk clerk and a medical lab technician, and a medium semiskilled job as a nurse aide. (*Id.*)

In the hearing, the ALJ proposed a fact pattern about a hypothetical claimant of Plaintiff's age, education and work history, who was restricted to a limited range of light work; could not be exposed to

work hazards; could not climb any ropes, scaffolds, or ladders; could only occasionally climb ramps or stairs, stoop, balance, crouch, crawl, or kneel; and who could stand or walk for up to six hours and sit for six hours in an eight-hour work day. (AR 50-51.) Further, because of depression, pain, and medications, this hypothetical individual would only be able to perform simple and lower level detailed tasks with normal supervision, and this person's social interaction and adaptation would be adequate for these tasks. (*Id.*)

The VE testified that this hypothetical person would be unable to return to past relevant work as a medical lab technician or as a beautician but that she could return to her prior job as a convenience store clerk. (AR 51.) The VE further stated that this hypothetical individual would not have any transferable skills but would be able to perform other light jobs such as a counter attendant in a restaurant or cafeteria, an informal waitress, a cashier, a retail receiving clerk, an usher, or a number of factory-based jobs including garment inspector or assembler of electrical accessories. (AR 51-52.) The VE stated that approximately 1,800 such jobs existed in Plaintiff's local economy and almost 2 million such jobs are available in the national economy. (AR 52.)

The ALJ then proposed a second hypothetical in which the individual in question could stand or walk for less than two hours, sit for four hours, lift less than ten pounds, would need to alternate between sitting and standing throughout the day, would have constant interruptions to her concentration and attention rendering her incapable of even low-stress jobs, would take unscheduled breaks throughout the work day, and would miss up to four days of work a month. (AR 52.) Naturally, based on this hypothetical individual's restrictions, the VE testified that there would not be any jobs that such a person could perform, even at the sedentary level. (AR 53.)

### III.    The ALJ's Decision

On September 11, 2009, the ALJ issued his written opinion in which he came to the following enumerated findings of fact to determine that Plaintiff was not disabled under sections 216(i) and 223(d) of the Social Security Act:

1.    Claimant meets the insured status requirements of the Social Security Act through March 31, 2011.

2.    Claimant has not engaged in substantial gainful activity since April 6, 2005, the alleged onset date (20 CFR 404.1571 *et seq.* and 416.971 *et seq.*).

3.     Plaintiff has the following severe impairments: heel spur on the left foot with plantar fasciitis; low back pain status post two lumbar surgeries; cervical pain status post fusion in May 2005; peripheral vascular disease; Arnold Chiari Malformation; and depression (20 CFR 404.1520(c) and 416.920(c)).

4.     Claimant does not have any impairments or combination of impairments that meets or medically equals one of the listed impairments . . . .

5.     Claimant has the residual functional capacity to perform light work, standing and/or walking six hours in an eight-hour day, sitting up to six hours in an eight-hour day, lifting twenty pounds occasionally and ten pounds frequently; avoiding more than occasionally climbing ramps and stairs; avoiding more than occasional stooping, balancing, crouching, crawling, and kneeling; avoiding climbing ramps, ladders, and scaffolds.  She can perform simple and lower level detailed tasks with normal supervision.  She has adequate abilities to adapt and interact socially.

6.     Claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.     Claimant was born on March, 19, 1969 and was 36 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.     Claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that Claimant is "not disabled," whether or not the plaintiff has transferable jobs skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering Claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.     Claimant has not been under a disability, as defined in the Social Security Act, from April 6, 2005 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(AR 12-18.)

To reach these conclusions, the ALJ considered the record as a whole and noted that while Plaintiff does suffer from several maladies, none of these physical or mental conditions—either individually or taken in total—amounted to disability as required by the Act.  (AR 15-17)  In coming to this conclusion, the ALJ gave little weight to the opinion of Dr. Denton, Plaintiff's treating physician, because Dr. Denton failed to "indicate which conditions or impairments supported his statement regarding limitations" and because Dr. Denton's opinion "departs substantially from the rest of the evidence of record"  (AR 15-16.)  Instead, the ALJ accorded greater weight to Dr. Surber, a consulting and examining physician because his opinion aligned with both his own findings and those of Dr. Uzzle.  (*Id.*)

The ALJ also determined that Plaintiff's daily activity level did not corroborate her subjective complaints of pain. (AR 16.) While acknowledging that Plaintiff's medically cognizable complaints would likely be expected to cause some of her alleged symptoms, the ALJ found that Plaintiff's statements "concerning the intensity, persistence and limiting effects of [Plaintiff's medically determinable impairments] are not credible to the extent that they are not consistent with [Plaintiff's] residual functional capacity test." (*Id.*)

The ALJ acknowledged that Plaintiff had alleged limitations due to depression but, using Plaintiff's testimony, records from Plaintiff's counselor indicating that she was progressing, and records from a consulting psychological examiner that found no significant mental limitations, the ALJ determined that Plaintiff retained the ability to adapt and interact socially and that her depression did not amount to the marked limitations necessary to satisfy listing 12.04. (AR 13; *see* AR 409-12, 453-58, 594-95, 778-80 (pertinent medical records).) The ALJ found that Plaintiff's mental impairment failed to meet at least two paragraph "B" requirements and that the evidence failed to establish the presence of any paragraph "C" criteria (AR 13). Similarly, the ALJ held that Plaintiff's back impairments did not satisfy the requirements of listing 1.04. (*Id.*)

The ALJ based his findings that claimant can perform jobs that exist in significant number in the national economy on the testimony of the Vocational Expert. (AR 17.) Based on Plaintiff's condition, the VE listed a number of jobs the plaintiff could perform and testified that approximately 1,800 such jobs exist in Plaintiff's region and over 2 million exist nationally. (AR 17-18.)

## IV. Applicable Legal Standards

### A. Standard of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. *Jones v. Sec'y of Health & Human Servs.*, 945 F.2d 1365, 1369 (6th Cir. 1991). The Act provides that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). The purpose of this review therefore is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether the Commissioner committed any legal errors in the process of

reaching that decision.  *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion."  *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  "Substantial evidence" has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance."  *Bell v. Comm'r of Soc. Sec.,* 105 F.3d 244, 245 (6th Cir. 1996) (*citing Consol. Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229 (1938)). Substantiality of evidence is based on the record taken as a whole.  *Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

The reviewing court does not substitute its findings of fact for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences.  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if the evidence could also support a different conclusion, the decision of the Administrative Law Judge as adopted by the Commissioner must stand if substantial evidence supports the conclusion reached.  *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).  Indeed, as long as substantial evidence supports the ALJ's conclusion and the ALJ applied the correct legal standards, this Court cannot reverse the ALJ's decision even if substantial evidence exists in the record that could have supported an opposite conclusion.  *Youghiogheny & Ohio Coal Co. v. Webb*, 49 F.3d 244, 246 (6th Cir. 1995).  If, however, the Commissioner did not consider the record as a whole, the Commissioner's conclusion is undermined.  *Hurst v. Sec'y of Health & Human Servs.*, 753 F.2d 517, 519 (6th Cir. 1985) (citations omitted).

In reviewing the decisions of the Commissioner, courts look to four types of evidence:  (1) objective medical findings regarding the claimant's condition; (2) diagnosis and opinions of medical experts; (3) subjective evidence of the claimant's condition; and (4) the claimant's age, education, and work experience.  *Miracle v. Celebrezze*, 351 F.2d 361, 374 (6th Cir. 1965).

**B.**    **Evaluation of Entitlement to Social Security Benefits**

Under the Act, a claimant is entitled to receive benefits only if he is deemed "disabled."  42 U.S.C. § 423(d)(1)(A).  The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in

death or which has lasted or can be expected to last for a continuous period of not less than 12 months."

42 U.S.C. § 423(d)(1)(A). Disability means a claimant, in light of her "age, education, and work experience," would be unable to "engage in any other kind of substantial work which exists in the economy." 42 U.S.C. § 423(d)(2)(A).

In applying the standards for determining disability, the Commissioner has promulgated regulations setting forth a five-step sequential evaluation process. *See* 20 C.F.R. §§ 404.1520 and 406.920. An ALJ must proceed through the required sequential steps for evaluating entitlement to disability insurance benefits. *See id.* The Sixth Circuit has summarized the five-steps of the sequential evaluation process as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997); 20 C.F.R. § 404.1520(b)-(f). The claimant has the burden of going forward with the evidence at the first four steps and the Commissioner has the burden at step five to show that alternative jobs in the economy are available to the claimant, considering her age, education, past work experience and residual functional capacity ("RFC"). *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

**V.     Analysis and Discussion**

Plaintiff contends that the ALJ erred (1) in rejecting the opinion of Dr. Randy Denton as Plaintiff's treating physician and (2) in discounting Plaintiff's subjective complaints of disability due to her combined impairments. (Pl.'s Brief 18.)

As set forth above, the questions for this Court are whether substantial evidence supports the ALJ's findings and whether he applied the correct legal standards. *Abbott*, 905 F.2d at 922.

**A.** **Whether the ALJ Erred By Not Giving Proper Deference to the Opinion of the Plaintiff's Treating Physician.**

The Sixth Circuit has consistently observed that even where the Commissioner's decision to reject a claimant's disability application is otherwise supported by substantial evidence, reversal will nonetheless be required if the agency fails to follow its own procedural regulations requiring the agency to "'give good reasons' for not giving weight to a treating physician in the context of a disability determination." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(2)). Opinions of disability from a treating physician are binding on the trier of fact only if they are not contradicted by substantial evidence to the contrary. *Strunk v. Astrue*, No. 08-201-GWU, 2009 U.S. Dist. LEXIS 33986 (E.D. Ky. Apr. 22, 2009) (citing *Hardaway v. Sec'y of Health & Human Servs.*, 823 F.2d 922 (6th Cir. 1987)).

An ALJ is generally required give more weight to opinions from treating sources since "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(d)(2). Further, an ALJ must give the opinion of a treating source controlling weight if he finds the opinion to be "well supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record." *Id.* The weight given a treating physician's opinion on the nature and severity of impairments depends on whether it is supported by sufficient medical data and is consistent with other evidence in the record. 20 C.F.R. § 404.1527(d); *Harris v. Heckler*, 756 F.2d 431 (6th Cir. 1985). If not contradicted by any substantial evidence, a treating physician's medical opinions and diagnoses are afforded complete deference. *Miksell v. Comm'r of Soc. Sec.*, No. 388, 2008 U.S. Dist. LEXIS 12913, at *21 (S.D. Ohio, June 12, 2008) (citing *Harris*, 756 F.2d at 435)).

If the opinion of a treating source is not accorded controlling weight, in determining what weight to give the opinion, an ALJ must consider factors such as the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source. *Harris, 756 F.2d at 431-35.*

The regulation requires the agency to always "give good reasons" for the weight given a treating source's opinion. *Id.* "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that her physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999). The requirement ensures that the ALJ applies the treating-physician rule and permits meaningful review of the ALJ's application of the rule. *Wilson*, 378 F.3d at 544-45 (citing *Halloran v. Barnhart*, 362 F.3d 28, 32–33 (2d Cir. 2004)). In addition, the Commissioner interprets 20 C.F.R. §§ 404.1527(f) and 416.927(f) as requiring ALJs to consider opinions of agency consultants "as opinions of nonexamining physicians and psychologists." SSR 96-6p. ALJs are not "bound by findings made by State agency or other program physicians and psychologists, but they may not ignore these opinions and must explain the weight given to the opinions in their decisions." *Id.*

Here, in both his December 2007 and July 2009 medical assessments, Plaintiff's treating physician Dr. Randy Denton limited Plaintiff to lifting less than ten pounds, standing/walking for less than two hours a day, and sitting for about four hours a day along with a litany of postural and environmental restrictions. (AR 486-89, 788-90.) Plaintiff argues that Dr. Denton's opinion, as the opinion of Plaintiff's treating physician, is entitled to great weight as medical source evidence and that the ALJ incorrectly accorded his opinion little weight. (Pl.'s Brief 18.) The Court nonetheless finds that the ALJ did not err in his treatment of Dr. Denton's medical opinion. The ALJ considered Dr. Denton's opinion within the entire context of Plaintiff's medical records and articulated adequate reasons for affording it little weight. (AR 15-16.)

The ALJ found that Dr. Denton did not offer any specific evidence to substantiate the limitations he included in his medical assessments. (AR 15-16.) Indeed, Dr. Denton's medical assessment forms from both 2007 and 2009 do not offer any medical evidence to support Dr. Denton's assessment of Plaintiff's limitations. For example, in the 2007 Medical Source Statement of Ability to do Work-Related Activities under the heading "Exertional Limitations", Dr. Denton answered questions 1-5, limiting Plaintiff's ability to lift/carry, stand, walk, sit, and push/pull but left question 6 "What medical/clinical finding(s) support your conclusions in items 1-5 above?" completely blank. (AR 486-87.) This trend of

providing numerous limitations but then not answering the questions requesting descriptions or explanations of these limitations and medical/clinical findings to support these limitations continues throughout the rest of the 2007 Medical Source Statement and the 2009 Medical Source Statement. (AR 487-89; 788-90.)

In essence, Dr. Denton's opinions are problematic because they consist entirely of forms with checked boxes and are wholly devoid of support for any of the limitations Dr. Denton ascribes to Plaintiff. (AR 487-89; 788-90.) Moreover, whether a physician's opinion provided for purposes of litigation by means of checking boxes and filling in blanks on a form regarding a claimant's ability to do work-related activities constitutes a medical opinion entitled to substantial deference remains questionable, particularly where, as here, the physician did not even attempt to support his opinions with reference to the medical record or his own treatment notes. *See Crane v. Shalala*, 76 F.3d 251, 253 (9th Cir. 1996) (holding that an ALJ "permissibly rejected" three psychological evaluations "because they were check-off reports that did not contain any explanation of the bases of their conclusions"); *Mason v. Shalala*, 994 F.2d 1058, 1065 (3rd Cir. 1993) ("Form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best."); *O'Leary v. Schweiker*, 710 F.2d 1334, 1341 (8th Cir. 1983) ("[W]hile these forms are admissible, they are entitled to little weight and do not constitute 'substantial evidence' on the record as a whole.") In this vein, the ALJ properly concluded that Dr. Denton's medical assessment was not entitled to significant evidentiary weight because Dr. Denton failed to indicate which conditions or impairments supported his assessment. (AR 15.)

Additionally, the ALJ determined that Dr. Denton's opinion "departs substantially from the rest of the evidence of record." (AR 16.) Although the ALJ does not explicitly provide any concrete examples to support this conclusion, he appears to support this finding implicitly by referencing and describing the assessments from other physicians—Drs. Gaw, Dimick, Surber, and Uzzle—that do not align with Dr. Denton's assessment. (AR 15; *see* AR 224-25, 260-61, 401-06, 781-87.) The ALJ may also be referring to inconsistencies within Dr. Denton's assessment and his own medical records for Plaintiff. For instance, while Dr. Denton's records do consistently paint a picture of a woman plagued by severe pain, they do not substantiate his extreme assessment of Plaintiff's limitations. Dr. Denton's records are replete with notes of Plaintiff's various complaints improving in response to time and treatment, Plaintiff's requesting release

to return to work, Plaintiff's responding well to various medications, and Plaintiff's coping with her medical issues, as well as physical findings suggesting the ability to walk with a normal gait and a lack of acute distress.  (*See, e.g.*, 559, 561-62, 570-71, 576-78.)

Largely because Dr. Denton failed to point to any specific medical evidence in support of his assessment of Plaintiff's work-related abilities, but also because the ALJ articulated admittedly threadbare but nonetheless sufficient reasons for rejecting those conclusions, the Court finds that the ALJ did not err in according little weight to the opinion of Dr. Denton as Plaintiff's treating physician.

**B.     Whether the ALJ erred in discounting Plaintiff's subjective complaints of disabling pain resulting from her combined impairments.**

Plaintiff contends that the ALJ erred in rejecting Plaintiff's reports of disability due to her pain and her subjective complaints.  (Pl.'s Brief 20.)  SSR 96-7p provides instruction on evaluating credibility as follows:

> In general, the extent to which an individual's statements about symptoms can be relied upon as probative evidence in determining whether the individual is disabled depends on the credibility of the statements.  In basic terms, the credibility of an individual's statements about pain or other symptoms and their functional effects is the degree to which the statements can be believed and accepted as true.  When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements.

Additionally, 20 C.F.R. § 404.1529(c) and 20 C.F.R. § 416.929(c) describe the kinds of evidence that the ALJ is to consider, in addition to the objective medical evidence, when assessing the credibility of an individual's statements, including:  (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, received for relief of pain or other symptoms; (6) any measures used to relieve pain or other symptoms; and (7) other factors concerning functional limitations and restrictions due to pain or other symptoms.  An ALJ should not reject statements made by a claimant merely because they are not substantiated by the available evidence and instead must evaluate a claimant's statements in relation to the objective medical evidence and with attention given to any inconsistencies between the claimant's statements and other evidence.  20 C.F.R. § 404.1529(c)(2), (4);  20 C.F.R. § 416.929(c)(2), (4).

Because pain tolerance is a very individual matter, a claimant's credibility is a significant consideration in the evaluation of pain.  *Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463

(6th Cir. 1987). An ALJ may, however, distrust a claimant's allegations of disabling symptomatology if the subjective allegations, the ALJ's personal observations, and the objective medical evidence contradict each other. *Moon v. Sullivan*, 923 F.2d 1175, 1183 (6th Cir. 1990). Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, the claimant's testimony, and other evidence. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 532 (6th Cir. 1997).

In the present case, the ALJ concluded that Plaintiff's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms" but that Plaintiff's statements "concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (AR 14, 16.) In particular, the ALJ stated that Plaintiff's recent marriage coupled with the fact that her husband had suffered a neck injury and relied on her for care pointed to Plaintiff's engaging in activities of daily living beyond what she alleged. (AR 16.) Moreover, the ALJ found the timing of Plaintiff's petition for SSI and DIB problematic: While Plaintiff alleges an onset date of April 6, 2005, she did not file until she had first pursued a workers' compensation claims and an insurance settlement, a process that resulted in her filing for SSI/DIB over eighteen months after her alleged onset date. (*Id.*) Additionally, the ALJ's decision makes reference to Dr. Dimick's analysis of Plaintiff's work-related injuries, in which Dr. Dimick concluded that Plaintiff's alleged injuries were inconsistent with the description of her accident. (AR 15, 307-09.)

While Plaintiff contends that there is not a significant conflict in her medical record with regard to conditions that would produce the incapacitating pain she describes, some contradictory evidence about the nature and severity of her pain does exist, thereby entitling the ALJ to make a credibility determination. In addition to Dr. Dimick's conclusions about her work-related injuries, Dr. Pilar Vargas concluded in her 2007 psychiatric review technique report that Plaintiff's claims of disability with regard to her psychological issues were only "partially credible." (AR 427.) Further, as described in the previous section, the various physicians' opinions regarding Plaintiff's RFC differ considerably. Additionally, as Defendant argues in his brief, Plaintiff's testimony described engaging in a number of activities such as driving, dusting, cleaning, and preparing meals that could indicate that Plaintiff possesses a better ability to cope with her pain than she alleged in her hearing testimony. (AR 27, 35-7; Doc. No. 20, Response to Plaintiff's Motion 27.)

Plaintiff asserts that her medical records demonstrate objective evidence of conditions that are of a disabling severity and could reasonably be expected to produce disabling pain. (Pl.'s Brief 20.) As prescribed in SSR 96-7p and the above-listed factors from 20 C.F.R. § 404.1529(c), the ALJ, after considering the entirety of the record, determined that Plaintiff's complaints of pain were inconsistent with her medical record and her own testimony. (AR 15-16.) Although Plaintiff understandably disagrees with the ALJ's assessment of her credibility, the ALJ articulated a basis for his credibility determination with regard to Plaintiff's level of pain and her residual functional capacity, and substantial evidence in the record supports this determination. (*Id.*) As such, the Court declines to disturb the ALJ's credibility findings.

## V. CONCLUSION

For the reasons discussed above, the Court finds that the ALJ applied the appropriate legal standards to reach his conclusion and that his decision is supported by substantial evidence in the record. Because the decision of the ALJ must stand if substantial evidence supports the conclusion reached, this Court cannot reverse the ALJ's decision, even though substantial evidence that could have supported an opposite conclusion exists in the record. *Youghiogheny & Ohio Coal Co.*, 49 F.3d at 246; *Her*, 203 F.3d at 389 (*citing Key*, 109 F.3d at 273).

Accordingly, the Court is bound to uphold the findings of the ALJ and Commissioner. An appropriate order denying Plaintiff's motion for judgment will be entered.

Thomas A. Wiseman, Jr.
Senior U.S. District Judge